for the appellant. Your Honor, there are three types of errors that were committed by the District Court that require reversal. First, although it acknowledged that the burden of proving a limited publication was upon the defendant, it ultimately found that the plaintiff failed to establish it was a limited publication. Second, that while it was required by the District Court to consider all facts and to construe them most favorably for the plaintiff in consideration of this motion, it did not do so. Those three fundamental errors in type, each by themselves, would be sufficient to require reversal. Together, they are fatal. Counsel, what I was looking for, to see whether there were proper copyright notices, whether publication was limited, what constraints were put on it, was those old magazines and used bookstores. Pictures of Marilyn Monroe are still marketable and bookstores sell them in their ephemera categories. You get these old magazines in used bookstores. They usually have stacks and stacks of them. All I could see was some almost unreadable Xerox copy of a microfilm, and I couldn't see the part of the magazine that says the pictures on pages 32, 39, and 47 are copyrighted by so-and-so. The rest of the pictures are copyrighted by this magazine or any of that stuff that you usually see. Huge record, though. I could have missed it. Are the magazines and pictures in here? They're not. That's part of the problem, and that was our objection. We asked the court not to consider those documents that were being offered, and they were bad photocopies of bad microfilm of excerpts of newspapers and magazines vouched in by counsel. Seems like your side could have done it as well as their side. Well, we don't know of any. You're the side that's claiming the copyright, aren't you? We are claiming copyright ownership. So it seems like you could put it in and say, see? See? It says right there, copyrighted. We couldn't find any, Your Honor. We haven't got any. It is the defendants who are claiming that these were generally published. It was their burden to establish that they were published without... You're claiming they were copyrighted. They're claiming they were published, and there's nothing we can really look at to make this easy. They're copyrighted by virtue of their creation and by the... But in those days, you also had to write copyright with the C and the circle and the date and who it's copyrighted by. Unless it is a limited publication in which case you're not required to do so. Our position has been since the outset that these were limited publications provided to a selectively defined group of persons for a limited purpose and not for further distribution or... I don't understand. Well, there are two categories of things. One is things that were published in magazines that were of general circulation, and the out as widely as possible in order to promote the movies. So I don't really see how that's limited publication if I've got the facts right. Well, we go back as we always must to what was the evidence of any distribution of publicity stills. And in fact, there was none. This is what we acknowledge. We acknowledge that Milton Green took these pictures. He was the author. We acknowledge that he provided these for the purposes of promoting the movies. Those I acknowledge facts. We don't dispute those facts. They are of record. Beyond that, what specific uses were made by the studios, the extent to which they were distributed or handed out to anybody is not established by any admissible evidence. You have the declaration of Mr. Weitzner. We have the declaration of Mr. Weitzner who worked for a very short period for Columbia with some universities with respect to film, who did no investigation with respect to the two studios that were involved regarding what their practices were, and whose testimony simply could not support what his conclusions were. Counsel, I shared your skepticism about Weitzner, frankly, because he never worked for any studios in the 1950s and didn't give any foundation to show that he knew anything about how studios operated in the 50s. Agreed. Still, promotional photos. How do you promote? It seems to me the nature of promotional photos is anybody who will take them, you give them to them. You go to concerts, they hand you promotional photos of the people that are singing. You walk down Broadway, people hand you cards promoting this and that. The whole idea of promotion is to spread the word and get people to discover something that they otherwise would not have spent money on. In principle, I agree entirely with what Your Honor has stated, but the fact that there was a promotional use does not make it less of a limited publication. There are cases that are of record. I agree with you. There can be promotion that's limited publication. For example, if you're an American photographer, you haven't given up your copyright by trying to promote your own photographic business by selling those photos. But this isn't like that. This isn't Green trying to promote his photos. It's the studio trying to promote the movie. Your Honor, I think if we look at the case law, what we see is the following. We have the Academy of Motion Picture Arts and Sciences. They gave out the Oscar statuette. They promoted movies and the industry using that statuette. The recipients widely advertised them. The studios used them in their advertising. They were included in magazines and newspapers nationwide, worldwide. Yet, that was a limited publication. It was clearly a promotional use. It was clearly to obtain widespread recognition. The estate of Martin Luther King. Another case, the famous speech, I Have a Dream. Widely distributed, yet found to be a limited publication and not a general publication. The mere fact that they appear in newspapers or magazines by themselves do not establish that these are not a limited publication. The cases are legion. The Martin Luther King case, the Rickover case, the Mr. Maestro case, the Documentaries case, the Burke case, all found that providing the work to news media for advertising and for promotion does not take it out of the scope of limited publication. The question that ultimately this case turns on is what did Milton Green do that would have injected this into the public domain as a general publication? And the evidence of record establishes only one thing that he did. He gave the photographs to the studios for a limited purpose that even the district court acknowledged. If the and only to promote those pictures, those movies, nothing more. And there is no evidence of record that there was any use by anybody outside that scope. The record also includes some photographs that were sent by the agencies used by the studios to newspapers and magazines with restrictive legends on the back. They clearly establish Do we have some place where we can look at the restrictive legends on the back? Yes, Your Honor. The court actually cites to it in the order itself at page 14 of the Order on Motion for Summary Judgment. It's in volume 8, page 2570. And the legend there said, License for display only in connection with the exhibition of this picture at your the testimony of Joshua Green, who for many years worked with his father regarding his father's practice and his custom of applying copyright notice on all stills that are released to studios. Yet the judge accepted the testimony of Mr. Weitzner, who was not employed at the relevant time, not employed at the relevant studios, conducted no investigation as to what the industry's custom and practice was, and then concluded that because there is such a custom and practice, these pictures were widely handed out and distributed. There is no evidence of record of such a distribution. What is of record are very poor copies of newspapers and magazines that do not adequately show the images to even allow us to be sure that the same image was used as opposed to the second frame over. Your Honors understand that photographers- Joshua Green had personal knowledge of his father's routine practice? Yes, he worked for his father for many years. He swore to that. It's in our reply brief, the specific quote from his deposition testimony. It was before the district court. Yet what the district court says, his testimony is conclusory and without foundation. And it's an express statement that says, I worked in my father's studio for many years. I have vivid recollection that these pictures and pictures of this type all had copyright notices on the back. It's not conclusory. It is not lacking in foundation. It is evidence that should have been admitted and at least would have created a disputed issue of fact. The ultimate question, Your Honor, is whether or not the three prongs of limited publication were established by the defendants, that those were not met. What the defendants and what the court acknowledged in its order is clearly the pictures were provided for a limited purpose. It then said, but there was no showing of any restriction against further use of distribution. That's inconsistent with its finding that it was for a limited purpose. It is also inconsistent with the very language of quotes showing that there were restrictions against further distribution of use. It also said that there was no showing that it was to a definitely, specifically definite group of persons, a limited group of persons. And yet the only evidence of record is that Mr. Green gave it to the studios and to nobody else. There's no contrary evidence to that. There's no discussion by the district court or explanation about how the court concludes that it was provided to somebody outside that limited group. The court really concluded that it was not to a specifically defined group of persons because it appeared in various of motion pictures with Martin Luther King, with Burke, with Abend, and with all the other decisions that are cited, frankly, very well cited and cataloged in the Martin Luther King case and the Academy case. Mr. Sorey, I wanted to ask you a different question from the limited distribution. And it's based on the document that appears in the attorney fees case. Yes, Your Honor. It's technically not part of the record in the other case. There'll be a question whether we can look at it in the other case. But you know, your opponents submitted what they said they believed to be a contract between Milton Green and Marilyn Monroe Productions to sign all his rights to that company. And that was in their brief. You've never replied to it. What's your position on that contract? We don't know enough about that document. Well, you don't challenge it? We don't know enough of it. It was not provided to us in the course of discovery while the case was pending. It was never a subject of examination, impeachment. We never were able Well, now it's submitted to the court in the attorney's fees case. Didn't you have any chance to challenge it then? No, we did not. It was submitted to the court after the motion for attorney's fees, I believe, was submitted to the court. And was beyond the scope of the question of the attorney's fees issue. Well, no, it's very relevant. If you didn't do any investigation, you'll never find out who owned the copyright. It bears very severely on your position as an attorney. Your Honor, that is a document we did not have. Our client never had that in his possession. It was produced by the defendants from sources they have yet not identified. That's true. We do not know what other documents in that transaction existed. It is our understanding that when the agreement between Meryl Monroe and Milton Green was first entered in the creation of Meryl Monroe Productions, no attempt was made to require that every picture that Milton Green took would belong to the studio. Well, the contract says that. Well, there were yet other documents in that relationship and separation documents. Do you know about them? We know that there were a series of documents. Well, how do you know what the content is if you don't know the documents? We don't have the full... Just imagine there might have been something else. You don't have any access at all. Correct. I don't think you should speculate that there's something else you don't know. I wholeheartedly agree, Your Honor, and that is part of the problem. We don't know a great deal about that document or the circumstances of that document. We have no basis for foundation that it is genuine, that it is complete, that it represents the entire understanding of the parties, that there were no other documents associated with it. We've never had a chance to confront that evidence nor to dispute it. It was not part of the record. Would you like us to send it back and you could dispute it if you wanted to? If the Court does remand the case, I'm doubted. It seems to me, and I just speak for myself, not my colleagues, that it goes very severely to your position as a lawyer if that was available and you did not discover it. It was not available to us. Well, you say that, but we'll find out from the other side. Well, Your Honor, I've represented this client for a number of years, and again, that too is not a matter of record in this case. And over the course of my various representations, I have never come across that document, nor has any other litigant that we have engaged with ever produced that document to us. This came as a complete surprise. We asked defendants to identify their source so we could investigate this. They never provided us any information. Well, that's a reasonable request. I agree with you. I think it was entirely reasonable. Was it covered by the discovery in the original case? No. Was there a request for production that would have included it? A very extensive request for production with respect to all documents associated with the relationships between the parties. So you made a request for production of the other side for whatever documents they had regarding the relationship of the parties? I think we asked them with respect to all documents they had in support of all of their positions with respect to all of their defenses, and it would have been encompassed within that. And did they produce it in response to that? We got responses. We got some productions. Wait. Listen to my question. Did they produce that document in response to the request for production? No, they did not. And they made a similar request of you, I take it. Correct. And we produced all documents we had. You didn't have the contract? We don't have it. What was the best evidence that Milton Green had the copyright? He was the author of the pictures. He owned and possessed the originals. If, and I will engage in a moment of speculation if Your Honor will allow, if in fact there was this agreement, separation agreement, that required and provided that Marilyn Monroe Productions was to own and retain the copyright in these, presumably they would have asked for and obtained the original negatives. He has negatives still to this day. He recorded and registered his copyrights in the copyright office. The estate, which is the successor in interest, never objected to that copyright, has never challenged that ownership, has never canceled those rights. It is now challenging it in other litigation today, but it did not for 50 years. That's the estate of Marilyn Monroe? That's the estate of Marilyn Monroe, now called Marilyn Monroe LLC. Your Honor, may I reserve the rest of my time? Thank you, counsel. Thank you. Counsel. Good morning, and may it please the Court. Andrew J. Thomas on behalf of the defendant appellee, VNU Business Media, Inc., which is now known as Nielsen Business Media. We'll continue to refer to it as VNU as we have in our briefs for the sake of simplicity. I would propose to first address the appeal from Judge Taylor's summary judgment order and then to discuss the appeal from Judge Stotler's attorney's fees order. I have a question that bothers me. I don't understand a couple things about the case. One thing I don't understand is why we don't have the photographs that were handed out, these publicity stills, front and back, originals that you can get. They have mountains of publicity stills of Marilyn Monroe pictures that use book and magazine stores, and I also don't understand why we don't have the magazines from used book and magazine stores. We don't seem to have anything we can really look at here. Your Honor, we do have a lot of material in which these photographs are published, although there's a great deal of Marilyn Monroe memorabilia. I don't have what I was looking for. When I read a magazine, I often notice that at page 2 or 3 or 4 of the magazine, there's some fine print about who owns which copyrights, and it's particularly so where they have photographs. These things are frequently sorted out. Also, when you look at magazines and journals of all sorts, there is often a footnote that says whether the journal owns the copyright or the author does, and I didn't have anything where we could just look at it. Everything seems to be speculation. Your Honor, on some of the – we have seven photographs at issue, and we did an extensive investigation to try to locate these seven photographs. Anyone hang around in used book and magazine stores? We looked through a lot of used bookstores. We looked through public libraries in New York and Los Angeles. We looked on eBay for collectors. We did all kinds of research, Your Honor. With respect to the magazines, we found a number of magazines in which these photographs were reproduced. We made all of those magazines available to the plaintiff. The magazines don't have copyright notices in Milton Green's name. We also found a number of – They weren't available to us, did you? The excerpts are available throughout the record. The newspapers' copies as well are available throughout. I think we just had unreadable copies of the cover of the magazine and the picture. I don't think we had the fine print about who owns what copyrights. Well, let me – there's two responses to that. First of all, with respect to the readability, we asked the plaintiff in deposition if the photographs were the same in these various publications as the ones at issue in the case, and he confirmed that they were. As Judge Taylor found in his order. That reminds me of that picture. What was it? Magritte, Picture of a Pipe, and the caption is, This is not a pipe. Well, it's not a pipe. It's a picture of a pipe. Right. Well, these are – in this case, they're both pictures. These are not the pictures. They're pictures of the pictures. Well, they're reproductions. They're not the same. For one thing, they're in black and white, and for another thing, they don't have the intermediate tonalities. Well, many of the pictures originally were in black and white. Some were, but black and white photographs have intermediate tonalities that don't show up on Xerox, and more important, they're often notations about copyright. Your Honor, with respect to the copyright notation, because Judge Taylor did also note on the readability that he examined them and could tell that they were the same, but with respect to the copyright notations, if there had been a copyright notice elsewhere in the newspaper or magazine in the name of the publisher, then, as they speculate, that would not have preserved any copyright for Milton Green, the author of the photographs, because the notice of the publisher in a collective work doesn't provide copyright protection to the author of the individual work. That's from the New York Times versus Decini and from cases from this circuit, including Self-Realization Fellowship and others. If there had been a copyright notice in the name of Milton Green elsewhere in any of these publications, that would not help their claim here either. In fact, the reason that I believe they didn't look for this and present it to the court is if those copyright notices had existed in those magazines in the name of Milton Green, then that would torpedo their case, because that would be an investing publication that would have provided a statutory copyright to Milton Green at that time that would have lasted for 28 years and would have expired in the mid-1980s. The evidence in the record is that there were no renewals of copyright in the 1980s by Milton Green. In fact, Milton Green never registered any copyrights in his photographs at any time during his life. Oh, I see. So your case is it really doesn't matter what they said. If they said copyright, it would be expired, and if they didn't say copyright, it would be public domain. It would be a general publication at the time in 1950. I get it. So it really comes down to general publication. Right. In our view, they either went into the public domain in 1956. Okay. I understand. Or in the mid-'80s. I understand your point now, and I didn't before. Thanks. The next question I have is how do you run up $770,000 in attorney's fees defending your right to publish pictures where you could have bought the rights for $175,000 maximum? Your Honor, we'd like to know that, too. This is a case where the initial damages were never high. I mean, the license value of these photographs was low. There's no profits that were made by the publisher. We lost money, and we tried to get out of the case early. Well, the publisher didn't mean to lose money. It meant to make money on the books. The book is a speculation. The money that matters is it would have been so cheap and easy to buy the right to publish the photos from the Milton Green archives that I'm wondering about the reasonableness of the attorney's fees, even if the hours, times, the rates are reasonable. The Supreme Court has advised us we should also look at the reasonableness relative to what's accomplished. And what's accomplished here is to avoid paying a vastly smaller sum for amicable agreement and permission to publish the photos. Well, I think there's a couple of responses to that, Judge Kleinfeld. First, at the time that the book was being published, the book publisher charged the author with locating photographs to be used in the book. The author went to PhotoFest, which is a photo archive in New York that's well-known and widely used, and asked for photographs that came without the necessity of getting any further permissions, photographs that he could just use in the book, essentially public domain photographs. That's kind of like pulling photos off the net and figuring you have a right to use them, or pulling songs off the net, figuring you have a right to publish them. Well, it's different from that. It's a photo archive that deals in a vast amount of public domain material. The photos that were published in the magazine, that were published in my client's book, that were obtained from PhotoFest did not have any notation on them that they were taken by Milton Green, that there were no copyright notices. Then YouTube and all these other outfits on the net that republish things can be a shield for anyone that chooses to reuse them and make money on them. Well, I think it's a different situation. If you're showing a Saturday Night Live episode, everybody knows that's NBC's copyrighted content. Here we have publicity photographs from the 1950s that nobody knew who took them. There was no indication. There was no photo credit. There was no copyright notice. The book publisher had no idea that Milton Green's son was claiming copyright ownership of these photos until this complaint was filed. I think every Marilyn Monroe fan and every photography fan probably knew that Milton Green was the man on Marilyn Monroe photos. Well, the testimony in the case from the author and from the publishing personnel at Watson-Gupfill, the book publishing division, was that they did not know that. They did not recognize the photos as being taken by Milton Green. These are, by the way, publicity photos that were taken in connection with the motion pictures. They are not modeling photos that Milton Green took of Marilyn Monroe that are much more famous and much more widely circulated. These are photos that are taken on the set to either document sets or for later use. Green was really famous as a photographer of Marilyn Monroe. He's well known as a photographer of Marilyn Monroe. That's true. The people that were publishing the book didn't know that these particular publicity photos were taken by Milton Green. The studios had publicity photos were taken by all kinds of either studio employees or independent contractors for the purpose of publicizing the films, not always taken by famous photographers or well-known photographers. Marilyn Monroe let other people take pictures of her on the set? Lots of people took pictures of Marilyn Monroe. In this particular case, the two movies were actually produced by or executive produced by Milton Green. So he was intimately involved in all aspects of the production of these movies, and he was the photographer as well. But he wasn't the photographer on other movies that Marilyn Monroe made. I have a more fundamental question for you about the attorney's fees issue. It doesn't appear to me that either Judge Stotler or Judge Taylor ever really exercised their discretion under applying the Fogarty factors in deciding that attorney's fees were appropriate here. Judge Taylor didn't have occasion to consider the attorney's fees. Well, in the judgment, he just said a motion for attorney's fees may be made. Right. That's all he said. Right. He just indicated that a motion could be made. We made that motion. By that time, Judge Stotler— But there's nothing in Judge Stotler's order where she discusses any of the Fogarty factors or even makes it clear that she's exercising her discretion that attorney's fees are warranted. Your Honor, plaintiff has characterized her order in that way, and I think that's not a correct characterization of the order. Well, if you just go to the order, just turn to the order for just a second. Let's see here. Make sure I got the right order. You know, she lays out the summary of parties' contentions. There's A. There's the defendant's motion. Then she says plaintiff's opposition, defendant's reply. And then we have discussion, and then she gets down to B, prevailing party. And basically all she says is, in the June 24th judgment, Judge Taylor decreed the plaintiff to be the prevailing party. Judge Taylor also ordered that defendant may recover its costs and directed that defendant may file a motion to recover its reasonable attorney's fees. The foregoing facts afford defendant a legally enforceable instrument, making defendant the prevailing party entitled to attorney's fees. See Richard S. versus Department of Developmental Services. If you go to that case, that case is talking about the Buchanan case, the Supreme Court's case, where you needed to establish a judicially declared right that's fixed. You know, I've read this several times to see what's going on here, and I just fail to see that the district court did what was required under Fogarty. I think the district court did do what was required under Fogarty. On page 851 of the record is her statement under 17 U.S.C. 505 that the court finds the defendant is entitled to recover its attorney's fees and costs under the Copyright Act. This follows her seven-page discussion, which does recite the party's contentions, but also walks through every one of them. That's the summary of your contentions that were made. It does. It also indicates that she is walking through every one of the Fogarty factors in that discussion. On page 846, she talks about the requirements under the Supreme Court and Ninth Circuit precedent with respect to – I'm sorry. On 845, she talks about the degree of success obtained, which is the first Fogarty factor, citing Jackson versus Axton, a Ninth Circuit case that applies the Fogarty factors. She continues at the bottom of that page to discuss the Fogarty case and the Ninth Circuit's jurisprudence under the Fogarty factors, and then continues citing Jackson again. She continues through the rest of that page to talk about the second factor, objective unreasonableness, indicating that she was cognizant of that Fogarty factor and the Supreme Court's requirements that she consider that. She continues through the following five pages to discuss the other Fogarty factors. I think the proper reading of Judge Stotler's decision, particularly in an appeal under an abusive discretion standard, is that she did not just completely ignore the United States Supreme Court decision in Fogarty and that the language about the legally enforceable instrument indicates that although we're a prevailing party eligible to apply for attorney's fees, the entitlement or the basis for the award is Section 505 of the Copyright Act, which is a conclusion she reaches after spending seven pages talking about the Fogarty factors. All she does is just summarize the party's contentions, and in the end she says, foregoing facts, if we're a defendant of a legally enforceable instrument, making defendant and prevailing party entitled to attorney's fees. Well, it's clear, regardless of how the precise wording that's used, in looking at the order, it's clear that she has considered all of the Fogarty factors and has discussed them in the order. The standard of review that applies to a district court's order granting attorney's fees is abusive discretion, as this Court recognized in the Maljack decision and in the Minehold decision, which are just two examples. And in Minehold it had a discussion of the abusive discretion standard, which said that the question is whether the district court was entirely without foundation in law or in fact for its decision awarding fees. Here, not only is she considering clearly the Fogarty factors, we think the record establishes a basis for the awarding of the fees and that she was correct and did not abuse her discretion. The Court, as you know, can affirm for any basis in the record. And indeed, in the Minehold case, the Court cautions against micromanaging district court's fee awards. So the issue is not whether Judge Stotler wrote her order awarding attorney's fees in the manner that your honors might have written it or that plaintiff's counsel might have preferred that she write it, but whether she abused her discretion in deciding in a situation where she clearly considered the Fogarty factors, that those factors pointed toward an award of attorney's fees in this case. And indeed, in some of the cases we cite in our brief, including Maljack, the Court finds that even though the district court's reasoning may be conclusory in an order awarding attorney's fees, that nevertheless it's not an abuse of discretion. And in that case where the Court obviously considered the factors, reduced the defendant's fee request, paid careful attention to the amount of fees that were awarded, the Court affirmed the fee award. I don't know if there's anything like that that's obvious here. It looked to me like there was a strong punitive element in the award of attorney's fees, very far from reducing it. And I frankly had trouble understanding the punitive element in light of the Oscars case and the Martin Luther King case. It looked to me as though those cases make this public domain issue pretty arguable. Your Honor, I think that the public domain issue is clear. I think one source of confusion is that in the plaintiff's argument he focuses- Maybe you could say why it's clear and not arguable despite those cases. Okay, I will. The plaintiff focuses on the limited purpose prong, which is only one prong of the three-part test under White v. Kimmel, which is the Ninth Circuit standard. The first prong of the test is whether the distribution is to a definitely selected group. In our situation, we have distribution nationwide as part of a national advertising and marketing campaign, such that tangible copies of photographs- I was there the day of Martin Luther King's speech. I was right there at the Lincoln Memorial, and the whole idea of that was to make it as nationwide in the words, the performance, everything, to have the maximum impact on the nation possible. It was all televised. There was a huge crowd. There must have been 300,000 of us. You couldn't be more public with respect to both the words and the performance. Exactly, the performance, Your Honor, and that's the key to the Martin Luther King cases. And the words. The words and the performance, but both of the cases that have addressed the Martin Luther King speech. There's a Southern District case called Mr. Maestro, and there's the Eleventh Circuit decision in the state of Martin Luther King v. CBS. Both of those decisions are based on the fact that a performance, even a very public performance of a work, is not a publication. Now, the interesting thing about the Eleventh Circuit's decision, and it is a fractured one-to-one decision, the three judges have three opinions, but the interesting thing about that is there is a consistent line in the footnotes of all of the judges' opinions, which indicate that the decision would have been much different if it is established that tangible copies of the speech were actually distributed to members of the public. I mean, that case, like many of the plaintiff's cases, is a case about performance, not distribution of tangible copies like we have in this case. And in particular in the Martin Luther King case, there's a footnote four that explains that if CBS could establish that copies of that speech were available in the press tent to members of the public to pick up, that would argue in favor of a general publication. And then there's also the fact that's noted in that footnote that the speech itself was actually republished the next month in the newsletter of the Southern Christian Leadership Conference without copyright notice. And the court indicates that in that situation, if that was with authorization of Martin Luther King, that would have been a general publication, because in that situation, a tangible copy of the speech would have been in the possession of members of the public. It would have been published without copyright notice. The result would have been different. But there was a factual dispute in that case about whether he had authorized that, and so there was no summary judgment on that point. That's the critical difference. And it comes down to the third prong of the White versus Kimmel test, which is whether the distribution of the photographs that Milton Green authorized, when he provided them to the studios and the publicists to further distribute, to publicize and promote and advertise these films that he had produced, whether there was any prohibition on their further distribution of those photographs. And in this case, the evidence is that there was not any further prohibition. It seems like there's an important inference to be drawn from keeping the negatives. You can make more prints from negatives. Keeping the negatives suggests he wanted to let people use the picture, but he would keep the right to further uses. Why isn't that a legitimate inference? Well, I don't think there's evidence in the record that he kept the negatives. But even if there was, he provided these photographs to the studios and the publicists with the intention that they would reproduce them, that they would create stills that would be distributed, that they would put them in these press books, they would give them to the press, and they would create a situation where they would end up with thousands of reproductions of these photographs being distributed to members of the public, to anyone that had money to buy a newspaper or to buy one of these screen magazines that were popular at the time, would end up with copies of these photographs that they would have a possessory interest in, which they could do with what they wanted, whether they could sell it to someone or lend it to someone or give it away. That's the real difference here, in this case, as opposed to the other cases like American Tobacco and Hirshhorn and Patterson and the other cases at the plaintiff sites, which all involved merely the display of a copyrighted work where there was a prohibition on copying. The American Tobacco case was displaying a painting with a strict prohibition on copying. Here we have an authorized nationwide distribution of these publicity photos to advertise motion pictures with the intention being that they're going to be widely reproduced, widely distributed, so that they end up in the hands of actual members of the public. When you look at these press books, which were the essentially catalogs and promotional documents that were sent out to all of the theaters, they had the photographs printed in halftones that they could just be cut out and given to the newspaper to be reproduced in the paper. There were opportunities to order copies of these photographs in lots of 1,000 and 5,000. I couldn't tell that from the exhibits. Those are in the exhibits for the press books, and we've described them in the brief with citations to the particular pages of the press books that indicate that some of these photographs can be ordered in lots of 1,000 or 5,000 to be put in handouts that you would hand out to all of your theater patrons. We cited an example. It's in the facts section of our opening brief where we try to walk through every photograph. Where one of the photographs... I want to ask you a question. You heard my discussion with Mr. Soni about the contract between the Maryland Monroe Productions and Milton Green, which appears somewhat mysteriously in your record in the attorney fees case. Can you tell us where it came from? Yes, Your Honor, and I'm glad you gave me an opportunity to clear that up. We did not have that document during the discovery phase of the case. We only received it after the summary judgment motion had been completely briefed. We received it from counsel for the estate of Maryland Monroe, Counselor Gibson. And in one of these other lawsuits that's been ongoing between the... What would be your position as to what notice we can give it? Your Honor, we submitted it in connection with the fee motion. We're not asking that you consider it with respect to the summary judgment motion. It wasn't part of the record on the summary judgment motion. I think it's suggestive on the fee motion of the lack of due diligence and investigation of the plaintiff before filing this lawsuit. As we indicated in that motion, there were a number of red flags that should have prevented them from filing this lawsuit in the first place. That's maybe the minor one compared to the... If you put yourselves in their position, how would they have obtained that contract? I'm sorry? How would they have obtained it? How would they, the estate of Maryland Monroe? It was in their files. I think that Milton Green would have obtained it because it was a contract that his father entered into with Maryland Monroe Productions, which was the company that he formed with Maryland Monroe. It's quite surprising to me that they didn't have a copy of it and they didn't produce it in discovery. Surprising to me that you didn't either. Well, we're just a book publisher. We only got it from the estate of Maryland Monroe much later. We didn't know it existed until... You're running up $770,000 in attorney's fees and you don't ask the Maryland Monroe estate whether they have anything that might be helpful? We asked them for all the documents they had with respect to the ownership of the photographs and we didn't get anything. We didn't have any reason to think that this work-for-hire agreement existed until we found out about it from counsel for the Monroe estate. At what time did those suits begin? Those suits have been going on for a few years. I think they began after ours, but I'm not exactly sure when. I see I'm over time. Thank you, Your Honor. Unless you have further questions. Thank you. I think this is a morning of summary judgment hearing and reviews, and the footnote that counsel referred to in the Martin Luther King case, footnote 4, from the Eleventh Circuit, admonishes in particular that in a case involving a question of general publication versus limited publication, we have to be very concerned what can be considered at summary judgment level and what can be ultimately determined at trial. On summary judgment, we look at the evidence which was admissible and on the record, and the evidence that was admissible and on the record does not establish that there was an unrestricted distribution or authorization by Milton King. It does not show that he offered those photographs to anybody other than a specifically selected group of persons for a limited purpose. The defendants did not carry their burden of establishing that there was a general publication and summary judgment should not have been granted to them. The important gatekeeper functions of the district court with respect to the evidence were abandoned in this case, and they should not have been. And the strong warnings and directions and teachings of the Supreme Court and of this court that the evidence must be construed most favorably for the non-moving party was not complied with. We ask for the reversal of this judgment. Thank you. Thank you, Counsel. The green versus BPI is submitted. We'll hear Mahindra versus Padia. You guys okay with going ahead? Yeah. You want to go ahead? Yeah. Let's go ahead.
judges: Noonan, Kleinfeld, Paez